# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PAUL GERMANO,
*Plaintiff,*

v.

No. 3:19-cv-01204 (JAM)

ROLLIN COOK *et al.*,
*Defendants.*

## INITIAL REVIEW ORDER

Plaintiff Paul R. Germano is a prisoner in the custody of the Connecticut Department of Correction. He has filed a civil rights complaint under 42 U.S.C. §§ 1983, 1985 and 1986 against numerous officials of the Connecticut Department of Correction ("DOC"). He principally alleges that he has suffered from severe physical, dental, and mental health issues and that the defendants have been deliberately indifferent to his health and safety. Based upon an initial review in accordance with 28 U.S.C. § 1915A, I conclude that some of Germano's claims should proceed while others should be dismissed as discussed in this ruling.

### BACKGROUND

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." Germano has filed a complaint that is neither short nor plain. Instead, he has filed what amounts to be a running monologue of a complaint that weighs in at an enormous book-length 224 pages with some 621 numbered paragraphs. The allegations span for nearly two-and-a-half years of his most recent imprisonment from April 2017 to August 2019, and Germano names some 23 individual or groups of defendants. At times the complaint alleges specific facts, while at other times it lapses into digressions, musings, and conclusory accusations. The sheer immensity of Germano's

complaint has vastly complicated and prolonged the effort to conduct an efficient and effective initial review of the complaint as required under 28 U.S.C. § 1915A.

During all relevant times at issue in the complaint, Germano has been incarcerated at the Garner Correctional Institution in Newtown, Connecticut ("Garner"). He names the following defendants:

- DOC Commissioner Rollin Cook
- Former DOC Comissioner Scott Semple
- Former Garner Warden Anthony Corcella
- Deputy Warden Borges of the same institution
- Counselor Supervisor Calderon
- Chief Operating Officer Robert Richeson
- Dr. Gerald Valletta
- APRN Jill Burns
- Colleen Gallagher
- HSC Nurse Cynthia Nadeau
- Nursing Supervisor Mike Desena
- Dr. Craig Burns
- Dr. Kociena
- Dr. Pierre
- Dr. Carhart
- CSW R. Bush
- Garner Grievance Coordinators (John Does)
- Garner Mail Review Staff (John Does)
- Connecticut Transport Unit (CTU) Mitchell
- Dr. O'Shea
- Commissary Manager Renzi
- Commissary Officer Fonton
- Commissary Officer Sarano

Notwithstanding the size of Germano's complaint, only some of these named defendants are alleged to have actually had relevant dealings with Germano.

By way of background, Germano alleges that he was previously incarcerated with the DOC from 1998 to 2012. Doc. #1 at 8 (¶ 31). Germano was arrested again in the Spring of 2017, and he was transferred in May 2017 to Garner where he has remained ever since. *Id.* at 14, 15 (¶¶ 56, 61). According to the State of Connecticut Judicial Branch website, Germano was found

guilty on two burglary charges by a jury, and he was sentenced to five years imprisonment on each charge on September 20, 2018.[1] Thus, for purposes of this ruling, I assume that Germano was a pretrial detainee until his sentencing in September 2018.

### *Germano's ankle and back conditions*

Germano alleges that at the time of his arrival at Garner in May 2017 he suffered from torn ligaments and a cyst in his left ankle, a pinched nerve in his upper back, and lower back pain, which he attributes to a herniated or degenerative disc condition. *Id.* at 14-21 (¶¶ 56, 61-52, 71-73, 79). Before his incarceration, medical providers had prescribed narcotic medications to alleviate these conditions. *Id.* At Garner, Dr. Valletta treated the pinched nerve in Germano's back with a medication to alleviate nerve pain and referred Germano for x-rays of his spine in October 2018. *Id.* at 25 (¶¶ 89-91); at 36 (¶ 124). The x-rays showed degenerative changes to Germano's spine, but Dr. Valletta did not think the changes warranted further evaluation or treatment. *Id.* (¶ 90). Every night, the pinched nerve in Germano's back interferes with his ability to sleep. *Id.* (¶ 92).

At times, Germano's lower back pain completely immobilizes him. *Id.* at 26 (¶ 95). Dr. Valletta prescribed medication and stretching exercises to treat Germano's lower back pain. *Id.* at 17 (¶ 68); at 26 (¶ 96). Germano sought a medical mattress to alleviate his back and pinched nerve. *Id.* at 24 (¶ 87). But Dr. Valletta denied the request. *Id.*

---

[1] *See* State of Connecticut Department of Corrections, *Inmate Information*, http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=230976 [https://perma.cc/2VTU-CGQQ] (accessed Jan. 16, 2019) (indicating that Germano, Inmate Number 230976, is serving a maximum sentence, imposed on September 20, 2018, of ten years of imprisonment); State of Connecticut Judicial Branch, *Criminal/Motor Vehicle Conviction Case Detail*, https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=44c625ac-e4cf-4c00-8913-d4833558194c [https://perma.cc/6EQL-8ELE] (last accessed Jan. 16, 2019) (conviction for second degree burglary, Case No. #H15N-CR17-0287719-S); State of Connecticut Judicial Branch, *Criminal/Motor Vehicle Conviction Case Detail*, https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=2aab5bc5-eebf-445f-9755-40024c40ae3c [https://perma.cc/AEF9-ZZF2] (last accessed Jan. 16, 2019) (conviction for third degree burglary, Case No. #H15N-CR17-0286836-S).

In February 2019, Dr. Valletta referred Germano for another x-ray of his lower spine. *Id.* at 27 (¶ 97). Because the x-rays did not show significant degenerative changes, Dr. Valletta did not submit a request to the Utilization Review Committee ("URC") for further evaluation of Germano's lower back. *Id.* (¶ 98). Germano's requests for status updates were ignored. *Id.*

Dr. Valletta treated Germano's ankle injury and pain with medication. *Id.* at 30 (¶ 106). Because the pain medication was not effective in alleviating Germano's ankle pain, Dr. Valletta scheduled an appointment in August 2018 with a specialist at the University of Connecticut Health Center ("UCONN") to have Germano's ankle examined. *Id.* at 30-31 (¶¶ 107, 109). But Germano could not attend the appointment due to food poisoning. *Id.* (¶ 109). Dr. Valletta did not submit a new request for an evaluation of Germano's ankle by a specialist until May 2019. *Id.* at 32 (¶ 112). As of August 2019, Germano had not been sent to UCONN for an evaluation of his painful ankle conditions. *Id.* at 33 (¶ 116).

### *Germano's foot injury*

On November 9, 2017, Germano suffered an injury to his left foot when he lost his balance and fell as he attempted to enter a prison van to be taken to a proceeding in state court. *Id.* at 9 (¶ 34). Correctional Treatment Unit Officer Mitchell was present at the time and failed to assist Germano in entering the van. *Id.* (¶¶ 35-38). Nor did the former DOC Commissioner Semple ensure adequate training for how a correctional officer should help a shackled prisoner into a transport van. *Id.* at 13 (¶ 52).

After the incident at the van, Dr. Valletta ordered x-rays of Germano's left foot. *Id.* at 11 (¶ 43). The x-rays revealed no fractures. *Id.* Dr. Valletta provided Germano with crutches and sent him back to his housing unit. *Id.* (¶ 45). Dr. Valletta did not prescribe pain medication for

Germano's foot because Germano was already taking medication for other painful conditions. *Id.* (¶ 44).

A month later, Germano could walk without crutches. *Id.* (¶ 46). At a visit with Dr. Valletta, Germano complained that his foot was still painful. *Id.* Dr. Valletta referred Germano for an x-ray and instructed him to perform stretching exercises with his left foot. *Id.* (¶ 47). But Dr. Valletta refused further medical treatment for his foot despite severe pain. *Id.* at 12 (¶ 49). Germano's complained to the chief medical supervisor, Robert Richeson, about the failure to treat his foot injury, but his complaints were ignored. *Id.* at 14 (¶ 54).

### *Germano's rectal condition*

In August or September 2018, Germano began to experience severe rectal pain. *Id.* at 35 (¶ 122). Germano observed a polyp or lesion in the area of his rectum. *Id.* At an appointment with Dr. Valletta on October 25, 2018, Germano described his rectal pain, his observation of a lesion or polyp, his belief that it was not a hemorrhoid, and his belief that the polyp or lesion may be caused by the potentially cancer-causing strain of HPV Germano had been diagnosed with some years prior. *Id.* at 36 (¶¶ 123-24). But the appointment was cut short, and Dr. Valletta did not examine Germano. *Id.* Germano's mother called and emailed Dr. Richeson about the polyp on November 30, 2018. *Id.* at 37 (¶ 127).

On December 4, 2018, Dr. Valletta did his own internal examination of Germano's rectum but did not make any visual observations. *Id.* at 38 (¶ 128). He concluded that Germano suffered from hemorrhoids and prescribed hemorrhoidal suppositories. *Id.* at 38-39 (¶ 128-30). Dr. Valleta insinuated—wrongly—that Germano's problems were a result of having anal sex. *Id.* at 39 (¶ 129). The suppositories did not relieve Germano's severe pain. *Id.* at 39, 41 (¶¶ 131, 136).

Dr. Valletta and another visiting physician saw Germano on February 20, 2019. *Id.* at 40 (¶ 134). During the appointment, the visiting physician questioned Germano about his symptoms and performed a physical exam. *Id.* at 41-42 (¶¶ 135-37). The physician and Dr. Valletta observed a lesion or polyp in Germano's rectal area. *Id.* at 42 (¶ 137). Dr. Valletta submitted a request to the URC to have Germano examined by a specialist. *Id.*

On April 9, 2019, two physicians at UCONN questioned Germano about his symptoms, examined his rectal area and diagnosed him as suffering from an anal fissure. *Id.* at 44-45 (¶¶ 142-43). The physicians treated the anal fissure and recommended that Germano undergo a biopsy and colonoscopy to rule out cancer, eat a high fiber diet, and use a sitz bath to keep the rectal area clean. *Id.* at 45-47 (¶¶ 144-47, 150). At the request of Dr. Richeson, Dr Valletta provided Germano with the necessary medical supplies to clean his rectal area. *Id.* at 48-50 (¶¶ 152, 158). Dr. Valletta would not prescribe a high fiber diet or increase Germano's prescription for Metamucil, a fiber supplement, explaining that "[i]f I give you a special diet then I'll have to give everyone a special diet, so no!" *Id.* at 50-54 (¶¶ 158-59, 168). Dr. Richeson likewise denied Germano a special diet. *Id.* at 50 (¶¶ 161-62).

### *Germano's dental conditions*

A few months after Germano arrived at Garner in May 2017, Germano lost a filling. *Id.* at 56 (¶ 174). At an appointment a short time later, Dr. O'Shea refused to re-fill the tooth and insisted that the tooth be extracted. *Id.* at 57 (¶¶ 176-77). The basis for his recommendation was that filling a tooth was more expensive. Germano refused to have the tooth pulled. *Id.* (¶ 177). Over the next two years, Dr. O'Shea filled two other teeth that had cavities but did not fill at least five other teeth that had cavities or re-fill the tooth with the lost filling. *Id.* (¶ 178); at 61 (¶ 189).

In April 2018, Dr. O'Shea informed Germano that he would fill the original tooth that had lost a filling with a temporary material if Germano was close to being released from prison. *Id.* at 59 (¶ 185). Just after speaking to Dr. O'Shea, prison officials at Garner transferred Germano to Whiting Forensic Hospital in Middletown, Connecticut ("Whiting") for two months. *Id.* (¶ 186). Upon Germano's return from Whiting, Dr. O'Shea indicated that he could not fill the tooth because there was too much decay and because the walls of the tooth were too weak. *Id.* Germano still refused to have the tooth pulled. *Id.* In May or June 2019, after the tooth had chipped, Germano agreed to have Dr. O'Shea extract it. *Id.* at 60 (¶¶ 187-88).

### Germano's mental health conditions

Germano has suffered from a number of mental health conditions since childhood. *Id.* at 8 (¶ 31). Those conditions include: attention deficit disorder ("ADD"), post-traumatic stress disorder ("PTSD"), severe anxiety, bipolar disorder with psychotic features, borderline personality disorder and anti-social personality disorder. *Id.* at 62 (¶ 192); *id.* at 94 (¶ 267). During his prior incarceration, mental health providers prescribed medications such as Ritalin, Klonopin, Adderall, and Xanax that alleviated the symptoms of Germano's various mental health conditions at least to some degree. *Id.* at 62-63 (¶¶ 19, 194). During the time period from 2012 to 2017, when Germano was out of prison, he took Ritalin, Xanax and Latuda, which were also at least somewhat effective in treating his symptoms. *Id.* at 64 (¶ 196).

In May 2017, APRN Burns began to treat Germano's mental health conditions at Garner. *Id.* at 70 (¶ 208). Germano informed APRN Burns that he had been prescribed Latuda to treat his bipolar condition and that he had experienced uncomfortable and sometimes dangerous side effects after taking other mental health medications such as Zyprexa, Depakote, Tegretol, and lithium. *Id.* (¶¶ 207-08). APRN Burns indicated that Germano would still have to try other

medications such as Zyprexa, Depakote, and lithium before she would prescribe Latuda because it was a non-formulary medication that required approval by the URC. *Id.* (¶ 208). APRN Burns indicated that she would review Germano's mental health records regarding medications he had previously been prescribed. *Id.* (¶ 209). She explained to Germano that she would not prescribe a narcotic mental health medication to him unless absolutely necessary or in compliance with a court order. *Id.* at 67 (¶ 202). Because APRN Burns would not prescribe Latuda for him, Germano agreed to take Zyprexa despite its known side effects of weight gain and lethargy. *Id.* at 70 (¶ 209).

From April 6, 2018 to May 22, 2018, Germano was confined at Whiting. *Id.* at 73 (¶ 214). During his confinement at Whiting, physicians prescribed Latuda and Thorazine on a daily basis to treat Germano's mental health conditions and symptoms and prescribed Ativan when needed. *Id.* at 73 (¶ 214); at 77 (¶ 224). Upon his return to Garner, APRN Burns discontinued the prescription for Latuda and re-started the prescription for Depakote. *Id.* at 73 (¶¶ 214-15). She also continued him on Thorazine which had helped Germano to sleep at night. *Id.* (¶ 215).

Because Depalote caused Germano to gain forty pounds and also inhibited his ability to think clearly, Germano asked APRN Burns to discontinue the Depakote prescription and to prescribe Latuda. *Id.* at 74 (¶ 216). APRN Burns refused to prescribe Latuda and insisted that Germano try lithium as a different alternative to Depalote. *Id.* (¶¶ 216-17). Germano did not want to take lithium because he had taken it previously and it had damaged his thyroid gland. *Id.* at 71 (¶ 211); at 74 (¶ 217). Over two years after starting to treat Germano, APRN Burns finally prescribed Latuda to treat Germano's bipolar disorder. *Id.* at 74 (¶ 217).

To treat Germano's ADD condition, APRN Burns prescribed Klonadine, a blood pressure medication. *Id.* at 75 (¶ 219). Germano did not want to take Klonadine because it was a sedative and made him lethargic. *Id.* After a year, APRN Burns prescribed another blood pressure medication to treat Germano's ADD. *Id.* at 76 (¶ 221). APRN Burns informed Germano that the Federal Drug Administration ("FDA") had approved the medication to treat severe ADD symptoms. *Id.* Germano took the medication for some time but experienced little alleviation of his ADD symptoms. *Id.* He questioned APRN Burns regarding the FDA's approval of the medication to treat severe ADD and she conceded that the FDA had not approved the form of the medication that she had prescribed to treat his ADD symptoms. *Id.* APRN Burns would not prescribe Germano the form of the medication that *had* been approved to treat severe ADD symptoms. *Id.* (¶ 222).

APRN Burns also refused to prescribe medication to treat Germano's severe PTSD and anxiety attacks. *Id.* at 78 (¶ 226). When Germano experienced anxiety attacks that necessitated his placement in a behavior observation cell, APRN Burns informed Germano that he did not require medication because he was simply overwhelmed. *Id.* (¶ 227).

### *Germano's respite and single cell status requests*

From approximately 2006 to 2012, Germano was confined on permanent single cell status. *Id.* at 94 (¶ 269). During his recent re-incarceration, Germano has not been placed on permanent single cell status, and at times prison officials and mental health providers have required Germano to be housed in a cell with a cellmate. *Id.* (¶ 269). On one occasion prior to his transfer to Whiting in April 2018, Germano was able to tolerate his cellmate, Jallen Jones. *Id.* at 96 (¶¶ 272-73). But Jones was "murdered" in some unspecified way by DOC officials on March 24, 2018. *Id.* at 98 (¶ 279).

After his return to Garner from Whiting in May 2018, Germano began to have increasing difficulties with his confinement in a cell with another inmate. *Id.* at 96 (¶ 272). The cellmate assigned to his cell in May 2018 was severely mentally ill, caused Germano undue stress, and stole some of his property during his trip to court on May 22, 2018. *Id.* at 100-01 (¶¶ 287-90).

Upon his return to Garner after his court trip, Germano was placed in a cell with a different cellmate who did not speak English and played loud Spanish music. *Id.* at 102 (¶ 293). When Germano expressed a need for mental health treatment because he was experiencing thoughts of suicide, mental health officials placed him in a cell on crisis/behavioral observation status for a week. *Ibid.* Warden Corcella said he would allow Germano single cell status if the mental health department said so, but then Dr. Carhart, apparently a member of that department, denied that he could order single cell status. *Id.* at 112 (¶ 313). Later, Warden Corcella said that Germano would have to get a court order to receive single cell status. *Id.* at 114 (¶ 317).

On August 24, 2018, mental health staff at Garner implemented a respite cell behavioral plan for Germano. *Id.* at 123 (¶ 346). Under this plan, provided that Germano was engaged in individual therapy sessions with a mental health provider, Germano could utilize a single cell for a week. At the conclusion of the week, he was required to return to a cell with a cellmate for two months before he could use the respite cell again. *Id.* At one point, Dr. Carhart informed Germano that the respite cell plan was being used to de-sensitize him to being in a cell permanently with another cellmate. *Id.* at 127 (¶ 362).

In October 2018, Germano informed mental health officials that he was very stressed because his cellmate was masturbating in the cell. *Id.* at 125 (¶ 355). Mental health officials informed Germano that they would place him in a single cell, but only under "person in crisis/behavioral observation status" rather than simply going to the respite cell. *Id.* Germano did

not want to go to be confined in a behavioral observation cell. *Id.* In response to these stressful circumstances, Germano attempted to commit suicide by attempting to cut an artery in his arm. *Id.* (¶ 356). Correctional Officers and mental health providers intervened to prevent Germano from seriously injuring himself and moved him to a cell in the mental health unit. *Id.* (¶ 357). Mental health providers placed Germano on crisis/behavioral observation status for over a month. *Id.* at 126 (¶ 359).

On November 27, 2018, mental health providers transferred Germano to a cell in general population with another cellmate. *Id.* at 130 (¶ 371). Prison officials discharged Germano's cellmate on December 5, 2018, and did not put another inmate in Germano's cell until January 7, 2019. *Id.*

In December 2018, Dr. Carhart assigned CSW Bush to be Germano's therapist. *Id.* at 135 (¶ 383). Germano did not like CSW Bush because he felt Bush had been deliberately indifferent to his mental health conditions, based on his prior experiences with Bush during a previous term of incarceration. *Id.* at 134-35 (¶ 381-84). In 2009, Germano named Bush in a prior lawsuit filed in this court, *Germano v. Cassidy, et al.*, Case No. 3:09cv1316(SRU) (D. Conn.). *Id.* at 134 (¶ 381). The case was dismissed against Bush in March 2011. *See Germano*, Case No. 3:09cv1316(SRU) (Doc. #73, Ruling Mot. Dismiss).

Germano refused to attend any therapy sessions with CSW Bush. *Id.* at 135 (¶¶ 384-85). On or about January 18, 2019, Germano experienced an episode of anxiety because his cellmate had been masturbating in the cell. *Id.* at 136 (¶ 386). Germano requested to be placed in the respite cell. *Id.* (¶¶ 387-88). CSW Bush refused to permit Germano to spend time in the respite cell because Germano had refused to engage in therapy sessions. *Id.* at 136-37 (¶ 386-89).

Instead, CSW Bush authorized Germano's placement in a cell on crisis/behavioral observation status. *Id.* (¶ 388).

On January 22, 2019, mental health providers transferred Germano from his crisis/behavioral observation cell to a cell with a cellmate in general population. *Id.* at 138 (¶ 393). On March 12, 2019, Germano's cellmate moved out of the cell. *Id.* at 139 (¶ 395). Later that day, a new inmate was placed in Germano's cell. *Id.* (¶ 396). Germano remained in the cell until March 29, 2019, when mental health providers permitted him to use the respite cell until April 9, 2019. *Id.* at 140 (¶ 399).

In March 2019, Dr. Carhart assigned a different mental health provider, CSW Bill Kompare, to be Germano's therapist. *Id.* at 140 (¶ 398). On April 9, 2019, Germano attended a medical appointment at UCONN. *Id.* at 141 (¶ 402). Upon his return to Garner later that day, Captain Hughes approved Germano's placement in a single cell due to his anal fissure condition and where he has remained for three months leading to the filing of his court complaint. *Id.* at 141-42 (¶ 402-07).

### *Conditions of confinement and retaliatory conduct*

Germano devotes multiple paragraphs of the complaint to a claim that Health Services Coordinator Nadeau, Colleen Gallagher, and Grievance Coordinators/Counselors Doe failed or refused to respond to or process his many medical and other grievances regarding conditions of confinement in accordance with the Department of Correction's Administrative Remedy procedures. *Id.* at 150-85 (¶¶ 426-519). He also describes various conditions of confinement that he experienced at Garner as well as multiple instances of alleged retaliatory conduct by some individuals who are defendants and some individuals who are not defendants. *Id.* at 185-207 (¶¶ 520-593).

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010).[2]

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Germano alleges that the defendants were deliberately indifferent to his physical, dental, and mental health needs and subjected him to unconstitutional conditions of confinement in

---

[2] The Court limits its review for purposes of 28 U.S.C. § 1915A to federal law claims. That is because the core purpose of an initial review order is to make a speedy initial screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If there are no facially plausible federal law claims against any of the named defendants, then the Court would decline to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367. On the other hand, if there are any viable federal law claims that remain, then the validity of any accompanying state law claims may be appropriately addressed in the usual course by way of a motion to dismiss or motion for summary judgment. More generally, the Court's determination for purposes of an initial review order under 28 U.S.C. § 1915A that any claim may proceed against a defendant is without prejudice to the right of any defendant to seek dismissal of any claims by way of a motion to dismiss or motion for summary judgment in the event that the Court has overlooked a controlling legal principle or if there are additional facts that would warrant dismissal of a claim.

violation of the Eighth Amendment, denied him the opportunity to pursue his administrative remedies in violation of the Fourteenth Amendment and retaliated against him for making complaints and filing grievances in violation of the First Amendment. He sues the defendants in their individual and official capacities for injunctive and declaratory relief and monetary damages.

### Claims under 42 U.S.C. §§ 1985 and 1986

Germano relies in part on his rights under 42 U.S.C. §§ 1985 and 1986. *See* Doc. #1 at 2 (¶ 5). But he does not allege facts that would plausibly allow for relief under either of these two provisions.

Section 1985 has three subsections. The first two subsections—1985(1) and 1985(2)—relate to conspiracies to prevent an officer from performing duties and conspiracies to obstruct justice. The allegations of the complaint do not implicate this kind of wrongful conduct.

The third subsection—1985(3)—applies to conspiracies to deprive a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws, and precedent makes clear that the conspiracy must be motivated by a "racial, or perhaps otherwise class-based invidiously discriminatory animus." *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015). Because Germano does not allege facts to show any type of conspiracy within the scope of section 1985, I will dismiss his section 1985 claims.

Section 1986 "provides a cause of action against anyone who, having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so." *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999) (cleaned up). A prerequisite for a claim under section 1986 is a cognizable claim under

section 1985. Because Germano has not plausibly alleged a section 1985 claim, I will dismiss his section 1986 claims. In the remainder of this opinion, I will analyze Germano's constitutional claims as being alleged under 42 U.S.C. § 1983.

### *Official capacity claims*

Because each of the defendants is an official of the State of Connecticut, the state's sovereign immunity forecloses Germano from proceeding against the defendants in their official capacity to the extent that he seeks an award of money damages. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). On the other hand, sovereign immunity poses no bar to Germano's official capacity claims proceeding to the extent that his complaint seeks relief for continuing deliberate indifference to his safety and serious medical needs. *See Virginia Office for Prot. & Advocacy v. Stewart*, 536 U.S. 247, 254 (2011); *Tsirelman v. Daines*, 794 F.3d 310, 313-14 (2d Cir. 2015).

Moreover, because an official capacity claim amounts to a claim against the state itself, *see Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007), there is no need to retain all of the many named defendants as defendants in their official capacity, and it is sufficient simply to retain DOC's Commissioner Rollin Cook as an official capacity defendant. *Cf. Odom v. Matteo*, 772 F. Supp. 2d 377, 392 (D. Conn. 2011) (dismissing official capacity claims against municipal officers as duplicative where municipality itself named as defendant). Accordingly, I will dismiss all official capacity claims against all defendants except as to Commissioner Cook with respect to any prayer for injunctive relief.

### *Deliberate indifference claims*

Germano alleges that the defendants were deliberately indifferent to his safety and serious medical needs. The legal standards that govern this type of claim are slightly different depending on Germano's status as a pre-trial detainee (April 2017 to September 2018) or a

sentenced prisoner (after September 2018). *See Darnell v. Pineiro*, 849 F.3d 17, 30-36 (2d Cir. 2017) (discussing distinction between deliberate indifference claim arising under the Fourteenth Amendment's due process clause for a pre-trial detainee and a deliberate indifference claim under the Eighth Amendment for a sentenced prisoner).

The first element of a deliberate indifference claim—known as "the objective prong"—requires a showing by the pretrial detainee or sentenced prisoner that the deprivation is sufficiently serious to warrant the need for treatment or more safety measures. *See id.* at 30-32. The second element of a deliberate indifference claim—known as the "subjective prong" or "mental element prong"—requires a showing of that the defendant acted with a culpable mental state. *Id.* at 32. A pretrial detainee "must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. A sentenced prisoner must prove an even more culpable mental state: "that the charged official possessed 'a state of mind that is the equivalent of criminal recklessness.'" *Benjamin v. Pillai*, 2019 WL 5783304, at *2 (2d Cir. 2019) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Simple negligence of prison personnel does not constitute deliberate indifference. *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).

### Medical Conditions—Dr. Valletta, CTU Officer Mitchell, and Commissioner Semple

Germano alleges that upon his admission to Garner in May 2017, he suffered from a painful ankle and back conditions which interfered with his ability to sleep and immobilized him at times. He contends that the medication prescribed by Dr. Valetta to treat his symptoms of pain in his ankle and lower back and the nerve damage in his upper back was ineffective. Although

Germano alleges that he has been able to engage in some exercise activities, he still experiences chronic pain in his back and ankle which interferes with his ability to sleep at night. Construing these allegations in Germano's favor, he has asserted sufficient facts to meet the objective component of an Eighth and Fourteenth Amendment claim for deliberate indifference to serious medical needs.

As regards his back and ankle pain, Germano states that Dr. Valletta had arranged for him to undergo an evaluation of his ankle injury by a specialist in August 2018, but when he missed the appointment due to food poisoning, Dr. Valletta did not attempt to re-schedule the appointment until nine months later. Even though Germano reported that the medication prescribed for his symptoms did not alleviate his pain, Dr. Valletta has not recommended any further treatment or evaluation of the cause of his back pain.

As regards his rectal condition, Germano alleged that in September or October 2018, he began to experience severe pain in his rectum. He became worried because he had been previously diagnosed as having a strain of HPV that can cause rectal cancer. In December 2018, Dr. Valletta diagnosed Germano as suffering from hemorrhoids and prescribed a topical ointment. Germano continued to experience pain in his rectum and sought to be examined by a specialist. Despite his complaints of pain, Dr. Valletta did not immediately refer Germano to a specialist for evaluation. Physicians at UCONN subsequently diagnosed Germano as suffering from an anal fissure. They treated the condition, prescribed procedures to keep the area clean and recommended that Germano be placed on a high fiber diet. Upon his return to Garner, Dr. Valletta refused to prescribe Germano the high fiber diet.

These allegations as to the severity of these conditions and the circumstances in which Dr. Valletta failed to treat Germano's ankle and back and rectal conditions are enough at this

very preliminary stage to plausibly allege that Dr. Valletta was more than merely negligent but deliberately indifferent to Germano's serious medical needs.

On the other hand, notwithstanding Germano's allegations that he injured his foot while boarding a prison van in November 2017, he has not alleged facts to show that Dr. Valletta was deliberately indifferent with respect to treatment of Germano's foot injury. Likewise, although Germano alleges that CTU Officer Mitchell neglected to help him safely negotiate the step into the prison van, resulting in his foot injury, these allegations sound at best in negligence and may not support a claim for deliberate indifference to safety. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015); *Darnell*, 849 F.3d at 36. The failure-to-train allegations against Semple fail for the same reason. Accordingly, I will dismiss Germano's claims against all defendants as to his foot injury.

Accordingly, I will allow Germano's claim for deliberate indifference to proceed against Dr. Valletta as to his ankle, back, and rectal conditions but will dismiss all claims arising from his foot injury.

### Dental condition—Dr. O'Shea

Germano alleges that the dentist Dr. O'Shea was deliberately indifferent to his serious medical needs. The complaint alleges that Germano lost a filling soon after arriving at Garner in 2017 but that Dr. O'Shea refused to give him a new filling on the ground that it would be too expensive compared to extracting the tooth. Germano eventually had to have the tooth extracted in May or June of 2019 and suffered needless pain.

The need for a tooth cavity is sufficiently serious for purposes of a deliberate indifference claim, because "a tooth cavity is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatments, such as root

canal therapy or extraction." *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000). In view of

Germano's allegations that Dr. O'Shea refused to give him a filling for reasons of cost savings

rather than for reasons of professional medical judgment, the complaint alleges enough facts to

plausibly suggest that Dr. O'Shea was deliberately indifferent to Germano's serious medical

need. *See Chance v. Armstrong*, 143 F.3d 698, 704 (2d Cir. 1998) (subjective prong for

deliberate indifference claim against dentists in light of allegation that "recommended extraction

[was] not on the basis of their medical views, but because of monetary incentives").

Accordingly, I will allow Germano's deliberate indifference claim against Dr. O'Shea to

proceed.

### Mental health medications—APRN Burns

Germano alleges that he suffers from ADD, PTSD, severe anxiety, bipolar disorder with

psychotic features, borderline disorder and anti-social personality disorder and that during

October 2018, he attempted to commit suicide by cutting an artery in his arm. This combination

of conditions constitutes a serious medical condition. *See, e.g.*, *Currytto v. Furey*, 2019 WL

1921856, at *5 (D. Conn. 2019) (inmate's allegation that he suffered from "anxiety disorder,

bipolar disorder, delusional disorder, and schizophrenia" constituted serious medical condition)

(collecting cases).

Germano alleges that APRN Burns became familiar with his mental health history from

reviewing his mental health records and speaking with him and was aware that he had been

prescribed various medications in the past. Germano contends that he informed APRN Burns that

he had suffered side effects from several medications and that one of the medications that she

recommended was contraindicated because it had previously damaged his thyroid gland. APRN

Burns insisted that Germano take these medications despite knowing that they had caused him

side effects. She would not prescribe a medication that had been effective in treating his bipolar condition, Latuda, because it was a non-formulary medication which she could not prescribe without seeking prior approval from the URC. Over two years after prescribing the medications that either caused Germano side effects or were not effective, APRN Burns finally prescribed Latuda for Germano.

The allegations that APRN Burns continued to prescribe various mental health medications despite Germano's complaints of serious side effects from the medication states a plausible claim of deliberate indifference to medical needs. *See Garrett v. Igbinosa*, 2018 WL 1605737, at *3 (E.D. Cal. 2018) ("Plaintiff has adequately alleged facts to show that Defendant acted with deliberate indifference when she continued the prescription for a generic medication despite being informed that Plaintiff was suffering painful side effects from it"), *report and recommendation adopted*, 2018 WL 2128278 (E.D. Cal. 2018); *Houck v. Wexford Health Sources, Inc.*, 2017 WL 3500400, at *6 (D. Md. 2017) (denying motion to dismiss Eighth Amendment deliberate indifference to medical needs claim against physician because inmate had plausibly alleged that physician had continued to prescribe him medication even when he had informed the physician of his concerns about negative side effects). I will allow Germano's deliberate indifference claim to proceed against APRN Burns.

### *Mental health counseling—Dr. Carhart*

Germano claims that Dr. Carhart assigned Bush to be his therapist in December 2018, even though Germano did not trust CSW Bush owing to their past history. Dr. Carhart did not change Germano's therapist until March 2019, and Germano chose not to attend therapy sessions with Bush and alleges that his mental health conditions suffered as a result of receiving no therapy for four months. Doc. #1 at 135 (¶ 385).

I conclude that these facts do not establish deliberate indifference by Dr. Carhart to Germano's mental health needs. Dr. Carhart prescribed mental health counseling for Germano, and the Constitution does not entitle a prisoner to a mental health counselor of his choice. That Dr. Carhart assigned Germano to work with Bush does not plausibly establish that Dr. Carhart was no less than deliberately indifferent to Germano's serious mental health needs, and therefore I will dismiss Germano's deliberate indifference claim against Dr. Carhart.

### Denial of respite cell—CSW Bush

Germano alleges that on January 18, 2019, CSW Bush did not permit him to go to the respite cell in retaliation for statements that Germano had made regarding Bush's faults to other individuals as well as Germano's unsuccessful lawsuit against CSW Bush in 2009.

As an initial matter, Germano has not plausibly alleged a deliberate indifference claim against Bush. Although Germano could not spend time as he wished in the respite cell, the complaint acknowledges that Bush placed him in a behavior observation status cell in the mental health unit. Doc. #1 at 388. Bush did not act as Germano wanted him to but the facts do not plausibly suggest that Bush acted with deliberate indifference to Germano's safety and health. Accordingly, I will dismiss Germano's claim against Bush for deliberate indifference to his safety or serious medical needs.

Germano appears to allege that Bush acted against him for retaliatory reasons. In order to establish a First Amendment claim for unlawful retaliation, a plaintiff must prove that he engaged in speech activity that is protected by the First Amendment and that a governmental defendant took adverse action against the plaintiff because of the plaintiff's protected activity. *See Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018); *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). A plaintiff must prove that he suffered an adverse action of sufficient magnitude

that it would deter a similarly situated person of ordinary firmness from exercising his or her First Amendment rights. *See Burns*, 890 F.3d at 93-94; *Wrobel v. Cty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012).

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation— can be characterized as a constitutionally proscribed retaliatory act." *Dolan*, 794 F.3d at 294. For this reason, a prisoner's First Amendment retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Ibid.*

The complaint lacks allegations to establish a plausible causal connection between Bush's restriction on Germano and any of Germano's complaints about Bush or his prior lawsuit against Bush many years before. Indeed, the complaint itself alleges that Bush did not permit Germano to go to the respite cell because Germano had not met the prerequisite of being involved in individual therapy sessions at that time, Doc. #1 at 136-37 (¶¶ 388-89), and Germano concedes that it was his own decision to refuse to engage in counseling sessions with Bush. Id. (¶ 384). Thus, by the complaint's own reckoning, there was a non-retaliatory reason for declining to authorize Germano's use of the respite cell. Accordingly, I will dismiss Germano's claim against Bush for retaliation in violation of the First Amendment.

### Denial of permanent single cell status

Germano alleges that he was wrongfully denied single cell status, despite having been housed in a single cell during his prior incarceration and despite his requests to be assigned to one upon his reincarceration. He alleges that single cell status alleviates his stress and reduces his

desire to self-harm, a desire that led him to attempt suicide in October 2018. He further alleges that he has been denied single cell status for retaliatory reasons.

The Constitution does not guarantee a prisoner a right to a single cell. *See McMahon v. Fischer*, 446 F. App'x 354, 356 (2d Cir. 2011); *Abrams v. Waters*, 2018 WL 1469057, at *5 (D. Conn. 2018); *Jarecke v. Hensley*, 552 F. Supp. 2d 261, 265-66 (D. Conn. 2008). Germano has not alleged sufficient facts to show that the denial of his requests for single cell status amounts to deliberate indifference to his safety and mental health needs. Nor has he alleged specific facts to show that the denial of his single cell requests have been for reasons of retaliation in violation of the First Amendment. Accordingly, I will dismiss Germano's claims arising from the denial of single-cell status.[3]

### Due process—grievance procedures

Germano alleges that Health Services Coordinator Nadeau and unnamed "John Doe" Grievance Coordinators/Counselors did not process his inmate requests and grievances according to the Department of Correction's Administrative Remedy procedures. He also contends that Ms. Gallagher and Counselor Supervisor Calderon failed to take appropriate action after being made aware of the alleged improper processing of grievances and requests at a meeting in April 2019.

I will dismiss these claims because the Constitution does not require that state prison officials comply with their own internal administrative procedures or that supervisory officials take steps to correct improper processing of prisoner grievances. *See, e.g.*, *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018); *Green v. Martin*, 224 F. Supp. 3d 154, 170 (D. Conn. 2016).

---

[3] I have previously denied Germano's motion for a preliminary injunction and temporary restraining order with respect to his single cell status request. *See Germano v. Cook*, 2019 WL 6486006 (D. Conn. 2019).

### *Supervisory Liability*

Germano has named Commissioners Cook and Semple, Wardens Corcella and Hannah, Deputy Warden Borges, Chief Operating Officer Richeson, Drs. Kocienda, Pierre and Burns, Nursing Supervisor Desena and Ms. Gallagher because of their roles as supervisors. He alleges that many times he and his mother sent written complaints, letters or requests to these officials regarding his mental health, medical and dental conditions, and treatment or lack of treatment. *See* Doc. #1 at 35 (¶ 121); at 61 (¶ 190); at 92-93 (¶¶ 263-65) and at 156 (¶ 442).

I conclude that Germano has plausibly alleged the involvement of the above supervisory officials in the alleged deliberate indifference of Dr. Valletta, Dr. O'Shea, and APRN Burns in response to Germano's physical, dental, and mental health needs. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (personal involvement of a supervisory prison official may be demonstrated if "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, . . . the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or . . . the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.") (citations omitted). Thus, Germano's Eighth and Fourteenth Amendment deliberate indifference to mental health, medical and dental needs claims will also proceed against Commissioner Cook in his official and individual capacities, and against former Commissioner Semple, Wardens Corcella and Hannah, Deputy Warden Borges, Chief Operating Officer Richeson, Drs. Kocienda, Pierre and Burns, Nursing Supervisor Desena and Ms. Gallagher in their individual capacities.

*Remaining claims not properly joined in single complaint*

Germano asserts additional claims under the First, Eighth and Fourteenth Amendments. Those claims are: retaliatory conduct by various defendants and non-defendants and restrictive/unconstitutional conditions of confinement, including denial of commissary items, an effective cleaning solution, multi-vitamins and other non-prescription medical products; excessive copying costs, lack of grievance receipts, property boxes, a law library, and an ombudsman. *See* Doc. #1 at 150-207 (¶¶ 426-593). He also describes various conditions of confinement that he experienced at Garner as well as multiple instances of alleged retaliatory conduct, not related to the provision of medical or mental health treatment, by some individuals who are defendants and some individuals who are not defendants. *Id.*

Federal Rule of Civil Procedure 20 permits joinder of multiple defendants in one action only if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions and occurrences, and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). The Court approaches the determination of "[w]hat [might] constitute the same transaction or occurrence . . . on a case by case basis." *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted).

Rule 21 of the Federal Rules of Civil Procedure provides that a court "may sever any claim against a party" pursuant to a motion filed by a party to the action or on its own. Fed. R. Civ. P. 21. In exercising its discretion to decide whether to sever a claim, a court should weigh the following factors: whether "(1) the claims arise out of the same transaction or occurrence; (2) the claims present some common question of law or fact; (3) settlement of the claims or judicial economy [would] be facilitated; (4) prejudice [would] be avoided; and (5) different witnesses

and documentary proof [would be] required for the separate claims." *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263-66 (D. Conn. 2012) (citation omitted).

I conclude that the additional allegations in the complaint pertaining to conditions at Garner and the retaliatory conduct do not all arise out of the same transaction or occurrence as the Eighth/Fourteenth Amendment deprivations of medical, mental health and dental claims. The claims of retaliatory conduct involving mail tampering, commissary items and random urine testing involve different defendants and factual issues. In addition, the allegations regarding various conditions of confinement are either not asserted against any particular individual or are asserted against individuals who are not defendants in this action. These claims are not reasonably related to each other and the factual and legal theories related to each claim are not common to each other. Different witnesses, testimony, and documentary evidence would be required to prove the separate sets of claims at trial.

All in all, I conclude that the sets of unrelated allegations and defendants are not properly joined in this action and that the relevant factors favor severance of these claims. *See Lindsay v. Semple*, 2019 WL 3317320, at *10–11 (D. Conn. 2019) (severing and dismissing without prejudice all claims unrelated to due process claim as improperly joined in violation of Fed. R. Civ. P. 20). *See also Wilson v. McKenna*, 2015 WL 1471908, at *6 (D. Conn. 2015) (advising plaintiff that improperly joined claims must be pursued in separate actions). That all the conduct Germano complained about occurred at one prison facility does not mean that Germano can address every wrong he believes has been done to him in a single lawsuit.

Therefore, pursuant to Fed. R. Civ. P. 20 and 21, I will sever and dismiss without prejudice Germano's Eighth and Fourteenth Amendment conditions of confinement claims and the First Amendment retaliation claims, as well as all other claims not related to the provision of

medical, dental, or mental health treatment. If Germano seeks to pursue these claims, he must do so by filing a separate lawsuit.

Germano is cautioned, however, that any separate lawsuit he may file must comply with the requirement of Fed. R. Civ. P. 8 that the complaint be a short and plain statement of his grounds for relief. If Germano chooses to file another outsized complaint, then this complaint will likely be dismissed on grounds that it is vexatious and inconsistent with the pleading requirements of the Federal Rules of Civil Procedure.

### *Motion to appoint counsel*

In his prayer for relief, Germano seeks the appointment of pro bono counsel. He states that he cannot represent himself because he is severely mentally ill and that attempting to litigate this case may ultimately result in exacerbation of his mental illness and symptoms. Doc. #1 at 222 (¶ F). Germano has already filed a separate motion seeking the appointment of counsel. On December 2, 2019, the Court denied the motion because Germano had not made an adequate showing that his sufficient likelihood of merit to warrant the appointment of counsel. *See* Order, Doc. #20.

Civil litigants do not have a constitutional right to the appointment of counsel. *See Leftridge v. Connecticut State Trooper Officer No. 1283*, 640 F.3d 62, 68–69 (2d Cir. 2011) ("A party has no constitutionally guaranteed right to the assistance of counsel in a civil case.") (citation omitted). Rather, the decision to appoint *pro bono* counsel in a civil case is discretionary. *See Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986) (district judges are afforded "broad discretion" in determining whether to appoint *pro bono* counsel for an indigent litigant in a civil case) (citation omitted); 28 U.S.C. § 1915(e)(1) ("The court *may* request an attorney to represent any person unable to afford counsel.") (emphasis added). In addition, the

Second Circuit has cautioned the district courts against routinely appointing *pro bono* counsel. *See, e.g., Hendricks v. Coughlin*, 114 F.3d 390, 393 (2d Cir. 1997); *Cooper v. A. Sargenti Co.*, 877 F.2d 170, 174 (2d Cir. 1989).

In considering whether to appoint *pro bono* counsel for an indigent litigant, a district court must "first determine whether the indigent's position seems likely to be of substance." *See Hodge*, 802 F.2d at 61. "[E]ven where the indigent [litigant's] claim is not frivolous, counsel is often unwarranted where the [litigant's] chances of success are extremely slim." *Cooper*, 877 F.2d at 171; *see also Carmona v. United States Bureau of Prisons,* 243 F.3d 629, 632 (2d Cir. 2001) (denying counsel on appeal where petitioner's appeal was not frivolous but nevertheless appeared to have little merit). Although I have decided that Germano has alleged enough facts at this time to allow the complaint to proceed beyond initial review, it is not clear at all to me that there is any merit to Germano's claims that he has been subject to deliberate indifference or retaliation in connection with his medical, dental, and mental health treatment. Although I am sympathetic to Germano's obvious mental health problems, the fact of these problems does not mean that his rights have been violated, and the law requires me to look not to the circumstances of the defendant but the merit of the complaint when determining whether to appoint *pro bono* counsel. Accordingly, Germano's request for appointment of counsel is denied.

### CONCLUSION

In accordance with the foregoing analysis, the Court enters the following orders:

1. Germano's Eighth and Fourteenth Amendment claims for deliberate indifference to serious medical needs may proceed

    a. with respect to his back, ankle, and rectal conditions, against Dr. Valetta in his individual capacity and Commissioner Cook in his official capacity;

    b. with respect to his dental conditions, against Dr. O'Shea in his individual capacity and Commissioner Cook in his official capacity;

    c.   with respect to his mental conditions, against APRN Burns in her individual capacity and Commissioner Cook in his official capacity; and

    d.   with respect to all of the above conditions, as a matter of supervisory liability, against Commissioner Cook in his official and individual capacities, and former Commissioner Semple, Wardens Corcella and Hannah, Deputy Warden Borges, Chief Operating Officer Richeson, Drs. Kocienda, Pierre and Burns, Nursing Supervisor Desena and Gallagher in their individual capacities.

2.   All other claims and defendants to this action are DISMISSED.

3.   The Clerk shall verify the current work addresses for the above-named defendants with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to those defendants at the confirmed addresses **within twenty-one (21) days of this Order**, and report to the Court on the status of the waiver requests by not later than **the thirty-fifth (35) day after mailing**. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

4.   All defendants shall file their response to the complaint, either an answer or motion to dismiss, **within sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

5.   The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

6.   The discovery deadline is extended to **six months (180 days) from the date of this Order**. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this order. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

7.   The deadline for summary judgment motions is extended to **seven months (210 days) from the date of this Order**.

8.   Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion (i.e. a motion to dismiss or a motion for summary judgment) **within twenty-one (21) days of the date the motion was filed**. If no response is filed, or the response is not timely, the Court may grant the dispositive motion without further proceedings.

9.   If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he **MUST** notify the court. Failure to do so may result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write PLEASE NOTE MY NEW ADDRESS on the notice. It is

not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he must indicate all of the case numbers in the notification of change of address. Plaintiff must also notify defendants or defense counsel of his new address.

10. Plaintiff shall utilize the Prisoner E-Filing Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court. As discovery requests are not filed with the Court, the parties must serve discovery requests on each other by regular mail.

11. Plaintiff's motion for appointment of counsel is DENIED.

It is so ordered.

Dated at New Haven this 17th day of January 2020.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge